# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

STEPHEN D. CVICKER,

       Plaintiff,

    v.                               Case No. 05-C-0576

LARRY P. MEYER, individually, and
in his official capacity as an employee of the
City of Whitewater Police Department,

       Defendants.

---

### DECISION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

### I. PROCEDURAL BACKGROUND

This action was commenced on May 24, 2005, when the plaintiff, Stephen D. Cvicker ("Cvicker"), filed a complaint in the Eastern District of Wisconsin alleging that his First and Fourteenth Amendment rights were violated by the defendants, Larry P. Meyer ("Meyer") and Roger Clapper ("Clapper"), in violation of 42 U.S.C. § 1983. On September 15, 2005, Cvicker filed an amended complaint which contained essentially the same allegations as had been set forth in the original complaint, as well as additional allegations of retaliation for Cvicker's filing of this complaint on May 24, 2005. In his amended complaint, Cvicker alleges that Meyer deprived him of liberty and property without procedural or substantive due process in violation of the Due Process Clause of the Fourteenth Amendment, subjected him to unlawful harassment in violation of the

Equal Protection Clause of the Fourteenth Amendment, and subjected him to unlawful retaliation for exercising his right to free access to the courts in violation of the First Amendment.[1]

On June 19, 2006, the parties filed a stipulation and an order was signed dismissing Clapper with prejudice from this action.

Currently pending before the court is the defendant's motion for summary judgment which is fully briefed and is ready for resolution. For the reasons which follow, the defendant's motion for summary judgment will be granted in part and denied in part.

## II. FACTUAL BACKGROUND

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendant's motion for summary judgment was also accompanied by a set of proposed findings of fact. A review of the parties' respective proposed findings, and the responses and replies thereto, reveals that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the defendant's motion for summary judgment.

Cvicker was charged with felony arson to a building in February of 2003, Walworth County Case No. 03-CF-104. On March 12, 2004, Cvicker was convicted by a jury. His post-conviction motion was withdrawn at the request of his counsel on May 26, 2006. (Def.'s Proposed Findings of Fact (DPFOF) ¶ 10.) Cvicker started criminal appeal rights in Case No. 03-CF-104, but he dismissed

---

[1]In his brief in opposition to the defendant's motion for summary judgment, Cvicker also asserts that Meyer violated his Fourth Amendment rights, and presents facts in support of this assertion. (Pl.'s Br. at 19.) Cvicker does not address the First Amendment unlawful retaliation claim in his brief, or allege facts which implicate First Amendment concerns. As such, the court will address the Fourth Amendment claim, but will not address the First Amendment retaliation claim.

the appeal as part of a plea agreement with the Walworth County District Attorney's Office whereby all the charges in case numbers 05-CF-35 (making fraudulent insurance claims and bail jumping) and 05-CF-368 (bail jumping) were dismissed. (Pl.'s Proposed Findings of Fact (PPFOF) ¶ 8.) Cvicker served one year in the Walworth County Huber Dormitory on the arson charge (PPFOF ¶ 2.)

Cvicker alleges that Meyer falsely accused him of, and maliciously caused him to be charged with, the crime of being party to the crime of arson to a building with intent to defraud the insurer of the building. (DPFOF ¶ 4.)

Cvicker alleges that Meyer falsely accused him of, and maliciously caused him to be charged with, the crimes of making and submitting fraudulent insurance claims and bail jumping. (DPFOF ¶ 5.)

Cvicker alleges that Meyer falsely accused him of the following criminal behavior when he knew or should have known that said allegations were false:

        a.    Seeking to procure arson
        b.    Making insurance claims with intent to defraud
        c.    Making false reports of alleged burglaries at his residence
        d.    Making false reports of alleged burglaries at his business
        e.    Embezzlement from his business
        f.    Tax fraud
        g.    Theft
        h    Sale or attempted sale of stolen property
        i.    Non-payment of child support.
        j.    Knowing employment of undocumented alien workers
        k.    Social security fraud
        l.    Knowledge of and covering up of identity theft by his employees
        m.    Huber Law violations
        n.    Probation violations
        o.    Bail jumping
        p.    Knowingly uttering false or fraudulent checks
        q.    Criminal damage to property.

(DPFOF ¶ 6.)

3

Cvicker alleges that Meyer maliciously caused him to be arrested on January 10, 2005, on false allegations of criminal activity, and in retaliation for filing a Motion to Set Aside Verdict and for New Trial in Walworth County Case No. 03-CF-104, State of Wisconsin v. Stephen D. Cvicker. (DPFOF ¶ 7.) Cvicker was charged with bail jumping and insurance fraud, and was placed on a probation hold. (PPFOF ¶ 14.) Cvicker alleges that he was unable to finalize an agreement with a potential buyer of his business because of his arrest on January 10, 2005. The original contract for sale of the business was to be signed on January 10, 2005. After failing to negotiate an agreement for the sale of the business, a subsequent agreement was reached with the buyer relative to providing materials, and the agreement required Cvicker to maintain a workforce. (PPFOF ¶ 16.)

Cvicker alleges that Meyer has engaged in malicious and intentional actions in retaliation against Cvicker for commencing this action on May 24, 2005. Cvicker's allegations of retaliation include:

   a.     Contacting employees or potential employees for the purpose of interfering with a contractual relationship. (Am. Complaint ¶ 408.)

   b.     Interference in business transactions involving the Plaintiff by contacting potential buyers, suppliers or customers and providing them with false information. (Am. Complaint ¶ 409.)

   c.     Contacting law enforcement officials at the Walworth County Jail resulting in the Plaintiff being wrongfully subjected to unfair conditions and harassment while serving jail time. (Am. Complaint ¶ 410.)

   d.     Sending a uniformed police officer to accompany a building or zoning inspector investigating reports the Plaintiff was living at his place of business. The Plaintiff alleges there is no reasonable basis for suspecting he has made his business the place of his residence, and that Investigator Meyer directed a police officer to write down license plate numbers causing Plaintiff's employees to be very nervous and upset and some employees to quit their job. (Am. Complaint ¶ 411.)

4

e.      Arresting an employee of the Plaintiff on July 14, 2005, at the Plaintiff's place of business with a "fanfare" intended to chill the remaining employees and disrupt the Plaintiff's business.  (Am. Complaint ¶ 412.)

f.      Falsely and maliciously arresting the Plaintiff on July 14, 2005, for bail jumping premised on false allegations.[2]  The Plaintiff alleges the arrest should have been carried out sooner and a reasonable method to pursue the criminal charge would have been the service of a summons rather than an arrest warrant.  (Am. Complaint ¶ 413.)

g.      Falsely and illegally arresting six of the Plaintiff's employees for not carrying driver's licenses and issuing citations to the employees and verbally intimidating employees of Mexican descent.  These acts are alleged to be an attempt to put the Plaintiff out of business and to retaliate for the filing of the lawsuit and are alleged to have shut down the Plaintiff's business thereby jeopardizing the completion of a business transaction of which Investigator Meyer was aware. (Am. Complaint ¶ 414.)

h.      Obtaining a search warrant for the Plaintiff's business under false pretenses.  (Am. Complaint ¶ 415.)

i.      Exceeding the scope of the search warrant during its execution, causing damage to his place of businesses and seizing documents and communications outside the scope of the warrant.  (Am. Complaint ¶ 416.)

j.      Removing all documents and notes regarding the Plaintiff's pending divorce and some events that occurred while serving a jail sentence.  Removing letters from his computer, including personal letters, removing all purchase and manufacturing agreements relating to Mountain West, all manufacturing agreements or other contracts, and all travel documents relating to a business trip.  (Am. Complaint ¶ 417.)

k.      Ransacking the mobile home and seizing or copying for personal use the personal documents contained therein that were unrelated to the search warrant.  (Am. Complaint ¶ 417.)

l.      Demanding Plaintiff's secretary make copies of documents and removing the copies without providing a receipt.  Seizure of Plaintiff's personal cell phone.  (Am. Complaint ¶ 418.)

---

[2]This allegation of bail jumping is based on an alleged violation of the conditions of bond set in January 2005, in which Cvicker was ordered to not have any contact with Eugene Cocroft.

5

m.      Ordering the Plaintiff not to hire another employee without checking out their social security number.  The Plaintiff alleges this directive was an unlawful threat and demand that the Plaintiff participate in unlawful discrimination against Mexicans. (Am. Complaint ¶ 419.)

n.      The Plaintiff alleges he has always completed federal withholding forms and he has dutifully withheld taxes from the pay of his employees and sent it timely to the IRS.  (Am. Complaint ¶ 420.)

o.      Falsely and maliciously arresting the Plaintiff on a charge of bail jumping and failing to read him his Miranda rights upon being taken into custody.  (Am. Complaint ¶ 421.)

p.      Delivering false reports to Plaintiff's probation agent in an attempt to have Plaintiff's probation agent put him on another probation hold.  (Am. Complaint ¶ 422.)

(DPFOF ¶¶ 8-9.)

The following is a factual background for each allegation by Cvicker relating to Meyer's conduct.

Accusations of Identity Theft

On or about October of 2003, Meyer investigated a theft of materials belonging to Mann Brothers Construction that were located at S.R. Hardscapes.  As part of his investigation he was given a list of employees of S.R. Hardscapes by Cvicker.  Of the fourteen employees listed, only one had a valid social security number.  (DPFOF ¶ 15.)  Some of the individuals were located, arrested, and released without charge per the instructions of the Walworth County District Attorney.  (DPFOF ¶ 16.)  Meyer told the 3-4 employees arrested for using false social security numbers that they could not work at S.R. Hardscapes.  (DPFOF ¶ 17.)

In October of 2003, Meyer explained to Cvicker and Michele Cvicker how to check the validity of social security numbers given to them by employees.  (DPFOF ¶ 27.)

6

In July of 2005, Cvicker testified in Walworth County Case No. 04-FA-331 that the payroll taxes had not been paid in three years and the sales taxes had not been paid in two years. He did not issue 1099 forms for the employees for whom he did not withhold taxes. When he took over the business he did not charge sales tax, even for retail items that were sold. (DPFOF ¶ 51.)

Fraudulent Insurance Claim

In April of 2004, Meyer investigated a burglary that occurred at S.R. Hardscapes involving the theft of tools and items from the shop area. As a result of the investigation, Lenny Falcone and Kenneth Causey were charged with burglary. (DPFOF ¶ 19.)

During the investigation of the burglary in April of 2004, Meyer became aware of a discrepancy between the items that had been reported stolen by Cvicker and the items that were recovered and which the perpetrators of the burglary admitted to having stolen. The individuals were interviewed separately and confirmed the nature and extent of what was stolen. (DPFOF ¶ 20.) One item of the discrepancy was a pressure washer. An old pressure washer was recovered that did not correspond to the hot water pressure washer that had been reported stolen. Meyer questioned the plaintiff about the discrepancy. (DPFOF ¶ 21.)

Meyer did the investigation of insurance fraud by Cvicker and submitted the information to the District Attorney. Meyer was informed by Cvicker that Cvicker drafted the list of items and provided the values of the items that were reported as stolen to the insurance company. Cvicker drafted the list in handwriting and told Michele Cvicker to type it up and fax it to the insurance company. (DPFOF ¶ 36-37.)

7

Cvicker reported additional events to Meyer involving his wife and alleged contacts by an unidentified third-person who had provided business records to the Plaintiff that cast Cvicker's then-wife, Michele Cvicker, in a negative light. (DPFOF ¶ 23.)

Cvicker provided records to Meyer relating to the contacts, saying they were left on the doorknob of his business and indicating someone was after Michele Cvicker, but later asked for the records back for the operation of his business. The records were returned to Cvicker. (DPFOF ¶ 24.)

Bail Jumping Due to Contact with Eugene Cocroft

Meyer received a complaint from Michele Cvicker regarding property in Whitewater. Michele indicated that she and Cvicker owned the property and that Cvicker and Eugene Cocroft had taken her name off of the property and were going to sell it. Meyer called Eugene Cocroft regarding the sale and reminded him of the no-contact order between him and Cvicker. He did not tell Mr. Cocroft that if he sold the property he would be prosecuted. (DPFOF ¶ 47.)

On February 23, 2005, the Walworth County Circuit Court, the Honorable Michael S. Gibbs presiding, held a preliminary hearing and determined that probable cause existed for the charges in Case No. 05-CF-35, making fraudulent insurance claims and bail jumping. On April 28, 2005, the Plaintiff pled no contest to felony bail jumping in Case No. 05-CF-35. That plea was later withdrawn upon motion of Plaintiff's counsel. (DPFOF ¶ 11.)

On September 21, 2005, the Walworth County Circuit Court, the Honorable Robert J. Kennedy presiding, held a preliminary hearing and determined that probable cause existed for the charge in Case No. 05-CF-368, bail jumping. (DPFOF ¶ 12.)

Embezzlement

Between May 28, 2004 and about July 25, 2005, there was a pending divorce between Cvicker and his then-wife, Michelle Cvicker. (PPFOF ¶ 11.)

Michele Cvicker made an embezzlement complaint to Meyer and indicated that she intended to call Meyer as a witness in the divorce action relating to the embezzlement complaint. (DPFOF ¶ 34.)

The embezzlement complaint included documentation relating to the removal of money from S.R. Hardscapes that was deposited into the bank account of Eugene Cocroft. Assistant District Attorney Dennis Krueger worked closely with Meyer and signed the subpoena for financial records. Michele Cvicker gave him documentation to substantiate her complaint of embezzlement and asked him to investigate it. (DPFOF ¶ 35.)

Cvicker testified at his divorce proceeding on July 25, 2005, that money coming into S.R. Hardscapes was transferred to Eugene Cocroft and deposited into his personal account. The Plaintiff did not keep records of these transfers. (DPFOF ¶ 52.)

In the decision in the divorce case, Walworth County Case No. 04-FA-331, the judge made the finding that:

> The Court finds there is ample and credible evidence that [the Whitewater Property] was in fact owned by [Stephen and Michele Cvicker]. The Court further finds that [Stephen Cvicker] intended to defraud [Michele Cvicker] on the transaction, as evidenced by his words and his deeds.

Child Support

Michele Cvicker complained to Meyer that Cvicker was behind on his child support. Meyer informed her that she had to report the complaint to the Sheriff's Department. Meyer is not aware

9

of the result of any investigation by the Sheriff's Department of her complaint. Meyer was not involved in any investigation of Cvicker relating to uttering a bad check. (DPFOF ¶ 40.)

Cvicker testified on July 25, 2005, at the divorce trial, that he did not make his monthly support payments to Michele Cvicker in 2005. (DPFOF ¶ 55.)

Probation Hold

Meyer did not inform Cvicker's probation agent that he should be placed on a probation hold. When a person who is charged is on probation it is standard practice to provide the probation agent with a report. The probation agent makes the decision whether to issue a probation hold or a charge of a violation of probation. (DPFOF ¶ 41.)

Sale of Stolen Truck

In January of 2005, Meyer received a complaint from Michele Cvicker regarding paperwork relating to the sale of trucks. (DPFOF ¶ 45.)

In responding to the complaint, Meyer contacted the buyer to determine if there was criminal activity relating to the pending sale and he determined that no crime had been committed. Meyer has no knowledge as to whether the sale of the trucks occurred or that the sale did not go through because of his phone call to the buyer. Meyer did not accuse Cvicker of theft or the attempted sale of stolen property. Meyer determined that no crime had been committed. (DPFOF ¶ 46.)

The following is the factual background regarding the events of July 13-15, 2005, which events involved the obtaining and execution of a search warrant, the arrest of certain Hispanic employees of Cvicker and of Cvicker himself, and the alleged harassment of Cvicker's employees subsequent to the execution of the search warrant and arrest.

10

A search warrant was served at Whitewater Rock & Mulch, 1002 S. Janesville, Street, Whitewater, Wisconsin, on July 15, 2005. (DPFOF ¶ 56.) As part of the execution of the search warrant a mobile home located on the property was searched by Meyer and Investigator Winger. (DPFOF ¶ 57.)

Cvicker testified at his divorce proceeding on July 25, 2005 that he lives primarily in the motor home at his business. When asked for his current residence address he stated 1002 Janesville Street, Whitewater, the address of S.R. Hardscapes. The decision issued by Judge Gibbs in the Divorce states the respondent currently lives in the 1996 Allegro Bay Motorhome. (DPFOF ¶ 50.)

During the search of the mobile home Meyer discovered documents subject to the search warrant. These documents included time cards for Julio Sanchez, and emails regarding Nestor Sanchez and Javier Sanchez. (DPFOF ¶ 58.) Meyer also discovered documents relating to a PeopleFinder search conducted by Stephen Cvicker of Gregory Tarkanian, brother of Stephen Cvicker's former wife, Michele Cvicker, n/k/a Michele Salter. Meyer had previously been informed by Michele Cvicker that she was concerned Cvicker had been stalking her and would attempt to follow her and Mr. Tarkanian on a vacation in Northern Wisconsin. These documents were copied as evidence relating to Michele Cvicker's allegations and out of concern for her safety. (DPFOF ¶ 59.)

Michele Cvicker told Meyer on several occasions that she was afraid of Cvicker. She drafted a memorandum regarding allegations of harassment. (DPFOF ¶ 42.) Her allegations were investigated by another officer at the Whitewater Police Department and by the Delevan Police Department, not Meyer. (DPFOF ¶ 43.)

11

The parties dispute whether Meyer took additional documents during the execution of the search warrant. Cvicker alleges that during the execution of the search warrant, Meyer seized Cvicker's personal property, including all the documents that Cvicker needed to conduct his business, all documents he intended to present at his divorce trial, all personal documents, all documents relating to his criminal appeal which was pending at the time, all personal communication with his children, and other documents which contained attorney client privilege. (PPFOF ¶ 23.) Meyer disputes that he took these documents. (Def.'s Response to PPFOF ¶ 23.)

Cvicker also alleges that Meyer destroyed some of these documents taken outside the scope of the warrant. (PPFOF ¶¶ 30-31.) Meyer disputes that he destroyed anything other than three copies of e-mails relating to the PeopleFinder search conducted by Stephen Cvicker of Gregory Tarkanian. (DPFOF ¶ 65.)

Sometime between July 13 to 15, 2005, Meyer arrested certain Hispanic employees of Cvicker.[3] (PPFOF ¶ 17.) Meyer transported employees who admitted to working without a valid social security number to the police station, and arrested and transported to the police station employees operating vehicles without a valid license. (Def.'s Resp. to PPFOF ¶ 18.)

The parties dispute what, if anything, was said to Cvicker's employees subsequent to the execution of the search warrant and their arrest. Cvicker alleges that Meyer told Cvicker's employees that they were not able to work at Cvicker's business. (PPFOF ¶ 22.) Meyer denies having told the employees this information. (DPFOF ¶ 29.)

_____

[3]Cvicker contends that all of his Hispanic employees were arrested. Meyer asserts that not all Hispanic employees were arrested.

12

The parties dispute what, if anything, was said to individuals from Walworth County Huber facility. Walworth County Huber facility employed individuals at Cvicker's business. Meyer contends that he did not tell anyone at the Huber facility that they should not allow people to work at S.R. Hardscapes. (DPFOF ¶ 30.) Cvicker denies this, and contends that something must have been said to cause him to lose his employees from the Huber facility. (Pl.'s Resp. to DPFOF ¶ 30.)

### III. SUMMARY JUDGMENT STANDARDS

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce

13

affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

Section 1983 creates a federal cause of action for "the deprivation, under color of [state] law, of a citizen's rights, privileges, or immunities secured by the Constitution and laws of the United

14

States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994) (internal quotations omitted). Section 1983 is not itself a source of substantive rights; instead it is a means for vindicating federal rights conferred elsewhere. *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Thus, the first step in any § 1983 analysis is to identify the specific constitutional right which was allegedly violated.

Cvicker alleges that Meyer's actions violated his Fourth Amendment rights by arresting Cvicker without probable cause, obtaining a search warrant without probable cause, and conducting an unreasonable search and seizure by going outside the scope of the warrant. Moreover, Cvicker alleges that his right to substantive due process guaranteed by the Fourteenth Amendment was violated by Meyer's various actions. Finally, Cvicker alleges that Meyer engaged in a campaign of harassment against Cvicker in violation of the Equal Protection Clause.

**A. Arson Charge**

Cvicker alleges that Meyer falsely accused and maliciously caused Cvicker to be charged with the crime of being party to the crime of arson to a building with intent to defraud the insurer of the building, and that Meyer falsely accused Cvicker of seeking to procure arson when he knew or should have known that the allegations were false. (Am. Comp. ¶¶ 402, 404.)

However, given that Cvicker's conviction for felony arson still stands and has not been appealed, Cvicker's claims involving Meyer's alleged false accusations of arson are not cognizable under § 1983. As stated by the United States Supreme Court:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks

15

damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).

In the case at hand, Cvicker's claim for damages for false accusation of arson necessarily call into question the validity of Cvicker's conviction. Moreover, Cvicker's conviction for felony arson has not been reversed, expunged, or called into question by a writ of habeas corpus. As such, because the arson conviction has not been invalidated, Cvicker's claims relating to Meyer's alleged false accusations of arson must be dismissed.

**B. Qualified Immunity**

Meyer argues that he is protected by the doctrine of qualified immunity from Cvicker's allegations of unlawful arrest and impropriety in his criminal investigations.

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determining whether qualified immunity shields officials from liability is a two-step inquiry. "[T]he court must determine (1) whether the plaintiff has asserted a violation of federal constitutional right, and (2) whether the constitutional standards implicated were clearly established at the time in question." *Eversole v. Steele*, 59 F.3d 710, 717 (7th Cir. 1995) (citing *Kernats v. O'Sullivan*, 35 F.3d 1171, 1176 (7th Cir. 1994)); *see also Sullivan v. Ramirez*, 360 F.3d 692, 697 (7th Cir. 2004).

The standard for determining whether a right is clearly established is particularized to the specifics of each case. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[T]he plaintiff must

16

demonstrate that a reasonable official, confronted with the specific facts at issue and the law in effect at the time, would have known that his conduct violated the plaintiff's constitutional rights." *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir. 1989). Qualified immunity shields an officer from liability under § 1983 liability if "'a reasonable officer could have believed [the plaintiff's arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.'" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson*, 483 U.S. at 641).

"'If a case involves a question of whether probable cause existed to support an officer's actions, the case should not be permitted to go to trial if there is any reasonable basis to conclude that probable cause existed.'" *McDonnell v. Cournia*, 990 F.2d 963, 968 (7th Cir. 1993) (quoting *Cross v. Des Moines*, 965 F.2d 629, 632 (8th Cir. 1992)). In an unlawful arrest case in which the defendant raises qualified immunity as a defense, the court will "'determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed.'" *Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001) (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)). "If the officers can establish that they had 'arguable probable cause' to arrest the plaintiff, then the officers are entitled to qualified immunity, even if a court later determines that they did not actually have probable cause." *Id*.

"A police officer has probable cause to arrest when, at the moment the decision is made, the facts and circumstances within [his] knowledge and of which [he] has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Xing Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999). "Moreover, this is an ex ante test: the fact that the officer later discovers additional evidence unknown to [him] at the time of the arrest is irrelevant to whether probable cause existed at the crucial time." *Id*. at 953-54.

17

Meyer concedes that the right to be free from arrest without probable cause was well-established at all times relevant to this dispute. (Def.'s Br. at 20.) However, Meyer contends that his actions were supported by probable cause. Meyer first argues that the existence of probable cause has been independently confirmed by judges at preliminary hearings, at which hearings the judges ruled that probable cause existed for the charges of fraudulent insurance claims and bail jumping. (Def.'s Br. at 20.)

Meyer points to the preliminary hearing held on February 23, 2005, at the Walworth County Circuit Court, in which Judge Michael S. Gibbs determinated that probable cause existed for the charges of making fraudulent insurance claims and bail jumping in Case No. 05-CF-35. As a result, according to Meyer, Cvicker cannot maintain a claim that his arrest on January 10, 2005 in connection with these charges was not supported by probable cause.

Meyer also points to the preliminary hearing held on September 21, 2005, at the Walworth County Circuit Court, in which Judge Robert J. Kennedy determined that probable cause existed for the charge of bail jumping in Case No. 05-CF-368. As such, according to Meyer, Cvicker cannot maintain a claim that his arrest on July 14, 2005, for bail jumping was not supported by probable cause.

In response, Cvicker argues that Meyer failed to inform the judicial officer of facts which he knew would negate a finding of probable cause. (Pl.'s Br. at 22.) Specifically, Cvicker contends that Meyer had exculpatory information related to the insurance fraud and bail jumping charges. Moreover, Cvicker argues that a judicial finding of probable cause does not necessarily insulate an officer from 1983 liability.

18

Cvicker may very well be correct in arguing that the results of the preliminary hearings, on their own, do not establish the existence of probable cause for Meyer's actions. Indeed, the Seventh Circuit has held that "judicial approval of a warrant affidavit cannot serve as an absolute bar to the section 1983 liability of the officer who submitted it." *Olson v. Tyler*, 771 F.2d 277, 282 (7th Cir. 1985). "Where the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth, not only does the arrest violate the fourth amendment, but the officer will not be entitled to good faith immunity." *Id*.

However, in addition to the judicial determinations of probable cause, Meyer also contends that Cvicker's admissions and testimony establish probable cause for Meyer's actions. Meyer notes that on April 28, 2005, Cvicker pled no contest to felony bail jumping in Case No. 05-CF-35, although Meyer concedes that this plea was later withdrawn upon the motion of Cvicker's counsel.

In regards to Cvicker's allegation that there was no reasonable basis for suspecting that he conducted his business at his place of his residence, and that there was thus no probable cause to send a uniformed police officer to accompany a building or zoning inspector who was investigating reports that Cvicker was living at his place of business, Meyer points to Cvicker's testimony at his divorce proceeding on July 25, 2005, in which Cvicker states that he lives primarily in the motor home at his business.

Meyer further argues that Cvicker's testimony in July of 2005, in which he testified in Walworth County Case No. 04-FA-331 that the payroll taxes had not been paid in three years and the sales taxes had not been paid in two years, and that he did not issue 1099 forms for the employees for whom he did not withhold taxes, establishes probable cause for the charges of tax fraud.

19

Moreover, Meyer contends that Cvicker's testimony that money coming into S.R. Hardscapes was transferred to Eugene Cocroft and deposited into his personal account establishes probable cause for Meyer's accusation of embezzlement.

Finally, Meyer argues that Cvicker's testimony at his divorce trial on July 25, 2005, that he did not make his monthly support payments to Michele Cvicker in 2005 establishes probable cause for Meyer's accusations of failure to pay child support.

To be sure, Cvicker's post facto testimony indicates that there was a basis for the charges of bail jumping, tax fraud, and failure to pay child support brought against him by Meyer. However, as noted above, the key question is whether the facts and circumstances at the time of the officer's actions established probable cause. Such being the case, Cvicker's later testimony or pleas after his arrests are irrelevant to the issue of whether probable cause existed at the time of his arrests. Meyer did not have access to Cvicker's testimony at the time he brought these charges against Cvicker.

Given that the judicial determinations of the existence of probable cause and Cvicker's testimony do not conclusively establish probable cause at the time Meyer took action against Cvicker, the court must examine the facts and circumstances surrounding Meyer's actions to determine if Meyer had probable cause to believe that Cvicker had violated the law at the time he took these actions.

"Probable cause is only a probability or substantial chance of criminal activity, not a certainty that a crime was committed." *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983). "The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003).

20

"And in crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." *Id*. Furthermore, "it is not the function of the police to establish guilt; the responsibility of sorting out conflicting testimony and assessing the credibility of putative victims and witnesses lies with the courts." *Id*. at 745.

Meyer contends that probable cause is amply supported by evidence upon which he was entitled to rely. Meyer argues that he relied upon statements and evidence gathered from a variety of witnesses and alleged victims in taking his actions.

The basis for the bail jumping charge on July 14, 2005, was the existence of phone call records between Cvicker's and Eugene Cocroft's phones (Braithwaite Decl., Ex. I), and a recorded conversation between a detective and Eugene Cocroft (Braithwaite Decl., Ex. J). Cvicker was not allowed to contact Eugene Cocroft, pursuant to a no contact order arising from an allegation that Cvicker and Cocroft were diverting funds from S.R. Hardscapes. Meyer also interviewed Eugene Cocroft and his sons prior to Cvicker's arrest.

In regards to the charge of insurance fraud, Meyer contends that his investigation provided him with sufficient evidence to establish probable cause. Specifically, Meyer details his investigation of a burglary in April of 2004 at Cvicker's business, in which Meyer became aware of a discrepancy between the items that had been reported stolen by Cvicker and the items that were recovered, and which the perpetrators of the burglary admitted to having stolen. The alleged burglars were interviewed separately and confirmed the nature and extent of what was stolen. Meyer interviewed Cvicker about one alleged discrepancy between an old pressure washer that was recovered that did not correspond to the hot water pressure washer that had been reported stolen. (DPFOF ¶¶ 20-21.)

21

As to Meyer's arrest of employees at S.R. Hardscapes and the investigation into identity theft, Meyer contends that the arrest was supported by probable cause because there was evidence of identity theft and Cvicker's employment of undocumented workers at his business at various times, including the time of the arrest. Meyer had investigated a theft of materials that were located at S.R. Hardscapes, and as part of his investigation was given a list of employees of S.R. Hardscapes by Cvicker. Of the fourteen employees listed, only one had a valid social security number. (DPFOF ¶ 15.) In July of 2005, Michele Cvicker provided Meyer with information indicating that multiple workers at S.R. Hardscapes did not have valid social security numbers

In regards to the charge of embezzlement, Meyer contends that he received a complaint of embezzlement from Michele Cvicker. Meyer also received documentation relating to the removal of money from S.R. Hardscapes that was deposited into the bank account of Eugene Cocroft. Michele Cvicker gave Meyer documentation to substantiate her complaint of embezzlement and asked him to investigate it. (DPFOF ¶¶ 34-35.)

As to the charge of attempted sale of stolen property, Meyer argues that he received a complaint from Michele Cvicker regarding paperwork relating to the sale of trucks. Meyer investigated this charge based on this complaint, and found that no crime had taken place. (DPFOF ¶ 45-46.)

Finally, as to the allegation of failure to provide child support, Meyer relied on Michele Cvicker's complaint to Meyer that Cvicker was behind on his child support. (DPFOF ¶ 40.)

In response, Cvicker focuses on the insurance fraud and bail jumping charges, and argues that Meyer knew that there was an insufficient factual basis for these charges. Specifically, Cvicker

22

contends that Meyer was aware of exculpatory evidence for both of these charges, but nevertheless pursued the arrest, charging, and search warrant.

As to the bail jumping allegation, i.e., the Cvicker's alleged violation of the no contact order, Cvicker contends that Meyer had exculpatory evidence indicating that Cvicker contacted Eugene Cocroft's residence to speak with Eugene Cocroft's sons, and not Eugene Cocroft himself. According to Cvicker, Meyer knew that Eugene Cocroft was the second shift plant manager for Cvicker's business, S.R. Hardscapes, and that both of Eugene Cocroft's sons worked at S.R. Hardscapes. Cvicker argues that Meyer had interviewed Eugene Cocroft and his sons, and was told that Cvicker would contact the Cocroft residence in connection with the sons' work duties, and would ask the sons to inform Eugene Cocroft about second shift matters related to work. As such, Cvicker contends that evidence of phone calls to the Cocroft household would not establish probable cause that Cvicker was in contact with Eugene Cocroft. (Pl.'s Br. at 20-21.)

In regards to the insurance fraud allegation, Cvicker argues that Meyer was given documents which may have indicated that Michelle Cvicker, rather than Cvicker, was attempting to defraud the insurance company. Cvicker notes that Meyer admitted that he did not review certain records provided to him by Cvicker. (Mistrioty Aff. Ex. A at 49.) Cvicker also contends that Meyer received evidence from Cvicker of a handwritten list of equipment and tools stolen from S.R. Hardscapes which Cvicker provided to his wife. Cvicker maintains that his wife was the person who ultimately submitted the claim to the insurance company. According to Cvicker, the list he provided to his wife has far lower replacement values than the list which his wife submitted to the insurance company. Such being the case, Cvicker argues that Meyer had evidence indicating that Cvicker submitted accurate information related to the loss, and that Michelle Cvicker may have been the individual

23

attempting to commit fraud. Nonetheless, according to Cvicker, Meyer chose to only investigate Cvicker. (Pl.'s Br. at 21.)

Cvicker also notes that Meyer had been meeting with Michelle Cvicker on a weekly basis prior to July 15, 2005, and that Meyer had considered asking Michelle Cvicker out. (Meyer Dep. at 93-4.) Cvicker also alleges that Meyer acted as a private investigator for Michelle Cvicker for her divorce case under the guise of an embezzlement and failure to pay child support investigation. This alleged work as a private investigator included Meyer's investigation into the sale of trucks and investigations involving Eugene Cocroft's property and business expenses. (PPFOF ¶ 27.)

Finally, Cvicker notes that the charges of bail jumping and insurance fraud were ultimately dismissed by Assistant District Attorney Dennis Krueger. Cvicker points to Krueger's declaration, in which he states that the charges were dismissed because there was insufficient evidence to sustain a conviction. (Krueger Decl. ¶ 3.)

To begin with, Meyer's possible ulterior motives in making his arrests are irrelevant to a determination of the constitutional reasonableness of the arrests. *See Williams v. Vasquez*, 62 Fed. Appx. 686, 691 (7th Cir. 2003). "'Regardless of the defendants' motives toward the plaintiff, the existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution.'" *Id*. (quoting *Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989)). As such, even if Meyer was motivated to arrest Cvicker because of retaliation or a desire to aid Michelle Cvicker in her divorce proceedings, there is no Fourth Amendment violation if Meyer's actions were otherwise supported by probable cause.

Furthermore, the termination of the prosecution does not necessarily establish that Meyer's actions lacked probable cause. *See Boyce v. Fernandes*, 77 F.3d 946, 950 (7th Cir. 1996). As noted

24

above, even if probable cause did not in fact exist at the time of the officer's actions, the issue is still "whether a reasonable officer could have mistakenly believed that probable cause existed." *Jaglowski*, 269 F.3d at 781.

In viewing the facts in the light most favorable to Cvicker, I conclude that Meyer's actions in making arrests for insurance fraud, bail jumping, and social security fraud and identity theft were supported by at least arguable probable cause. Moreover, I conclude that Meyer's actions in investigating the complaints of embezzlement, attempted sale of stolen property, and failure to pay child support were also supported by at least arguable probable cause.

For the insurance fraud charge, Meyer had evidence of both what was stolen and what Cvicker reported as being stolen through interviews of the alleged burglars and of Cvicker. Cvicker admits that there was a discrepancy regarding replacement values and fair market values of the items claimed for insurance, and that the old pressure washer recovered did not correspond to the pressure washer that had been reported stolen. To be sure, Cvicker has argued that Meyer ignored potential exculpatory evidence which implicated Michelle Cvicker in the alleged insurance fraud. Although the parties dispute whether Meyer was even in possession of the hand-written notes prior to the arrest, such evidence would in any event not have negated the existence of probable cause for the arrest of Cvicker. While the handwritten notes might raise questions as to why Michelle Cvicker was not arrested as well, Meyer still had evidence of insurance fraud based on his interviews and the submitted insurance report.

Similarly, the existence of potential exculpatory evidence relating to the charge of bail jumping does not negate the other evidence supporting probable cause. To be sure, during Meyer's interview with Eugene Cocroft, Cocroft alleged that the phone calls were for his sons, and that he

25

did not speak with Cvicker. However, Cocroft's denial contradicts evidence indicating that Cocroft was in contact with Cvicker. Eugene Cocroft, in a recorded conversation with Detective Bob Sharp of the Walworth County Sheriff from May 17, 2005, admitted that he had talked with Cvicker almost everyday from the period of March 8 through April 16. (Braithwaite Decl., Ex. I) Moreover, Meyer was in possession of phone call records which indicated that Cvicker had made calls to Cocroft's cell phone multiple times. (Braithwaite Decl., Ex. J.) Such being the case, Meyer had sufficient evidence with which to establish probable cause to arrest Meyer on a bail jumping charge despite Cocroft's statement to the contrary.

As to Meyer's investigation of social security fraud and identity theft, Meyer had sufficient evidence with which to establish probable cause to investigate and eventually arrest certain employees of S.R. Hardscapes. Meyer was given a list of employees of S.R. Hardscapes by Cvicker which list indicated that multiple workers at Cvicker's business did not have valid social security numbers. Meyer subsequently arrested and released employees at S.R. Hardscapes, and told those arrested that they could not work at S.R. Hardscapes.

Cvicker does not dispute the validity of this list, but alleges that the timing of Meyer's later investigation of Cvicker's Hispanic employees in July of 2005 was suspicious because this list was two years old at that time, and Meyer did not act on this information until days prior to the divorce trial between the Cvickers. However, according to the search warrant application, on July 6, 2005, Meyer was given a list of employees by Michelle Cvicker with their social security numbers, and Meyer confirmed that the social security numbers listed were not valid. Meyer also interviewed an employee of S.R. Hardscapes who admitted to having a false social security card. (Braithwaite Decl. Ex. D.) As such, Cvicker was not relying solely on the old list, but had received current information

26

from Michelle Cvicker which he verified. Meyer's investigation in July of 2005, for which he eventually obtained a search warrant and arrested Cvicker's employees, was supported by probable cause.

Moreover, Meyer's investigation of embezzlement, attempted sale of stolen property, and failure to pay child support were also supported by probable cause. Specifically, the complaints by Michelle Cvicker were enough to establish cause for Meyer to perform a preliminary investigation. As stated above, "[t]he complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp*, 320 F.3d at 743.

To be sure, Michelle Cvicker's pending divorce with Cvicker could create a basis for suspicion of the complaints. "[I]f the alleged victim bears a grudge against the suspect, a reasonable police officer should be suspicious of that person's complaint and investigate further." *Spiegel v. Cortese*, 966 F. Supp. 684, 692 (N.D. Ill. 1997) (citing *Hebron v. Touhy*, 18 F.3d 421, 422-23 (7th Cir. 1994)). However, there is evidence that Meyer did not rely solely on Michelle Cvicker's complaints, and that he investigated Michelle Cvicker's complaints further before taking any serious action. As to the embezzlement complaint, Meyer was provided documentation indicating that funds were removed from S.R. Hardscapes and deposited into the bank account of Eugene Cocroft. Meyer investigated the embezzlement matter based on Michelle Cvicker's complaint and the documentation, but it does not appear that he took action beyond conducting a preliminary investigation.

In regards to Michelle Cvicker's complaint of attempted sale of stolen property, Meyer further investigated the complaint by contacting the buyer to determine if there was criminal activity relating

27

to the pending sale. Meyer did not further pursue the charges after this preliminary investigation. As to the complaint of failure to pay child support, it does not appear that Meyer took any substantial action with regards to this allegation.

In sum, Meyer has established that he had 'arguable probable cause' to arrest Cvicker and to investigate the claims made against him by Michelle Cvicker, and is thus entitled to qualified immunity for these actions. Even assuming the existence of some exculpatory evidence, there nevertheless existed a reasonable basis to conclude that probable cause existed.

Cvicker also questions the validity of the search warrant obtained on July 15, 2005, and whether the application was sufficient to establish probable cause. Meyer argues that the factual basis was substantial, as detailed in Meyer's affidavit in support of his application for the warrant. (Braithwaite Decl. Ex. D.) Meyer also notes that the search warrant was issued by a judge.

"In determining whether information submitted to a judicial officer in support of a warrant application was sufficient to establish probable cause, we look only at what the officer knew at the time he sought the warrant, not at how things turned out in hindsight." *Beauchamp*, 320 F.3d at 743. Probable cause exists when it is reasonably believed that the evidence sought will aid in the prosecution of a particular offense and the evidence is located in the place to be searched. *See United States v. McNeese*, 901 F.2d 585, 592 (7th Cir. 1990), *overruled on other grounds by United States v. Nance*, 236 F.3d 820 (7th Cir. 2000).

As stated in Krueger's declaration, Meyer requested that Krueger pursue a search warrant for Cvicker's business prior to July 14, 2005, but Krueger refused because he did not believe there were sufficient grounds to obtain a search warrant. (Krueger Decl. ¶ 4.) Meyer then approached another assistant district attorney to request a similar search warrant to the one Krueger had initially refused

28

to pursue. This occurred while Krueger was on vacation. The other assistant district attorney approved the search warrant without knowledge of Krueger's position toward the search warrant. (Krueger Decl. ¶ 5.)

Despite the manner in which Meyer obtained the search warrant, I nevertheless conclude that the information Meyer submitted to the judicial officer in support of the search warrant was sufficient to establish probable cause. The warrant was to be used to search for items relating to charges of identity theft and bail jumping, and the application indicates that there was a reason to believe that such evidence would be located at S.R. Hardscapes. Specifically, the application is based on Meyer's interviews with various employees at S.R. Hardscapes on July 14, 2005, the day before the warrant was executed, Meyer's surveillance of the area on July 14, 2005, Steven Cvicker's presence at the location and his subsequent arrest on July 14, 2005, as well as employee application records provided to Meyer by Michelle Cvicker. Michelle Cvicker, on July 6, 2005, also provided Meyer with time cards and invoices indicating that Cvicker had contact with Eugene Cocroft.

Furthermore, the earlier rejection of the warrant application by Assistant District Attorney Krueger does not negate the existence of probable cause. Much of the basis of the application is related to information gathered by Meyer on July 14, 2005, after his initial meeting with Krueger. As such, this earlier rejection was for a warrant application supported by different facts. Although it is true that Meyer sought approval of the application during Krueger's vacation, Meyer did not attempt to simply take the exact same warrant application and resubmit it to a different assistant district attorney. The search warrant application approved on July 15, 2005 contained information obtained by Meyer on July 14, 2005, and such information was not available to Meyer at the time he submitted the original search warrant application to Krueger.

29

In sum, Meyer has established that he had at least "arguable probable cause" to arrest and investigate Cvicker, and to obtain the search warrant. Such being the case, Cvicker is entitled to qualified immunity for these actions. However, the inquiry does not end here because Cvicker does not allege that Meyer's constitutional violations are solely based on his acting without probable cause. Rather, Cvicker contends that Meyer violated his right to equal protection by engaging in an orchestrated campaign of harassment directed against him out of sheer malice, violated his right to substantive due process through shocking conduct, and violated his Fourth Amendment rights by exceeding the scope of the search warrant.

Cvicker alleges that Meyer engaged in a campaign of harassment by intimidating his present and prospective employees so that they would no longer work at S.R. Hardscapes, timing his arrests in order to disrupt Cvicker's business, and investigating and making arrests without probable cause. As discussed above, Meyer is not entitled to qualified immunity if (1) Cvicker can assert a violation of federal constitutional right, and (2) if the constitutional standards implicated were clearly established at the time in question.

For the first threshold issue, the court considers whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 199 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id*. I conclude that Cvicker is unable to meet this first step because the facts alleged do not show that Meyer's conduct violated Cvicker's right to equal protection.

To be sure, Cvicker has a constitutional right to be free from harassment directed towards him out of sheer malice. As the Seventh Circuit has stated, "[i]f the power of government is brought to

30

bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court." *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995). Although "[t]ypically equal protection claims involve charges of singling out members of a vulnerable group for unequal treatment or charges that a law or policy makes irrational distinctions between groups of people . . . equal protection claims may also involve a 'class of one,' where the plaintiff alleges that only he 'has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). In these cases, "[t]he 'class of one' plaintiff bears the burden of proving that he has suffered intentional, irrational, and arbitrary discrimination." *Id*. This requires proving "that the action taken by the state, whether in the form of prosecution or otherwise, was a spiteful effort to 'get' him for reasons wholly unrelated to any legitimate state objective." *Esmail*, 53 F.3d at 179. "This is more demanding than merely having to prove that a prosecution lacked probable cause." *Id*.

However, Cvicker's allegations do not establish that Meyer violated this right. As an initial matter, and as discussed above, Meyer's actions related to his arrests and investigations of Cvicker were supported by probable cause. Such being the case, these actions were related to a legitimate state objective, and thus cannot be used to prove a spiteful effort to "get" Cvicker. As to the other allegations, they do not rise to the level of being "wholly unrelated to any legitimate state objective."[4]

---

[4]Certain allegations by Cvicker appear to be related to Roger Clapper, a co-defendant who was dismissed from this case. These include allegations of false accusations of criminal damage to property and contacting law enforcement officials at the Walworth County Jail which resulted in Cvicker being subjected to unfair conditions and harassment. Cvicker does not specifically discuss these allegations in his brief.

31

Cvicker alleges that, subsequent to the execution of the search warrant and the arrest of the Hispanic employees at S.R. Hardscapes, Meyer told employees that they were not able to work at Cvicker's business, but were not told they could not work at any other place of business. (PPFOF ¶ 22.) Cvicker presents affidavits from his former employees indicating that Meyer told them not to return to work at S.R. Hardscapes or else there would be trouble, but that he did not tell them that they could not continue to work at their jobs at a local egg farm. (Ricardo Gonzalez Decl.¶¶ 4-9; Uvel Diaz Declaration ¶¶ 4-9.) These were second shift workers who did not show up for work after the first shift workers were arrested by Meyer. (Schultz Decl. ¶ 19-21.)

However, even assuming this to be true, this does not establish harassment for reasons "wholly unrelated to any legitimate state objective." As discussed above, Meyer had probable cause to believe that a number of employees at S.R. Hardscapes did not have a valid social security number, and there would presumably be no difference in status between the first and second shift workers. Moreover, Meyer's interviews with the second shift employees was done as part of Meyer's investigation into the identity theft charges. As such, Meyer's telling workers, whom he had probable cause to believe did not possess a valid social security number, that they could not work at S.R. Hardscapes was not without a rational basis.

Cvicker also alleges that Meyer harassed him by forcing the Hispanic employees to sit in the sand with their hands in the air during the arrest. (PPFOF ¶ 18.) Moreover, Cvicker alleges that, prior to the execution of the search warrant, Meyer had the Whitewater Police Department regularly go to Cvicker's business for unknown reasons. (PPFOF ¶ 20). Cvicker also contends that, during the execution of the search warrant, Meyer arrived with several squad cars in a show of force. (PPFOF 21.) Furthermore, Cvicker alleges that an employee of his was arrested on July 14, 2005,

32

at Cvicker's place of business with a "fanfare" intended to chill the remaining employees and disrupt Cvicker's business. Again, even assuming these allegations are true, they do not demonstrate intentional, arbitrary, and irrational discrimination. Cvicker has not alleged that any of these actions violated standard protocol for an investigation, arrest, and execution of a search warrant.

Cvicker also alleges that he was unable to gain employment of individuals from the Rock County Huber Dormitory subsequent to the arrests and execution of the search warrant. Cvicker infers that Meyer must have told officials at the Huber facility to not allow people to work at S.R. Hardscapes. Even if this allegation were true, it is still insufficient to establish the existence of an irrational, orchestrated campaign of harassment. Indeed, if Meyer did warn Huber officials against allowing people to work at Cvicker's business, he did have some basis for his actions. Telling officials to not let Huber prisoners work at a business suspected of employment violations is not without any rational basis.

Moreover, even if Cvicker was able to meet the first prong of the qualified immunity test, he is unable to show that the constitutional standards implicated were clearly established at the time in question. The standard for determining whether a right is clearly established is particularized to the specifics of each case. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

> [O]ur cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* (citations omitted).

"When considering the qualified immunity issue on a motion for summary judgment, a district court should consider all of the undisputed evidence in the record, read in the light most favorable to the non-movant." *Green v. Carlson,* 826 F.2d 647, 650 (7th Cir. 2005). A court "should consider evidence beyond the allegations in the plaintiff's complaint" *Id*.

Plaintiffs can show whether the constitutional standards were clearly established by pointing to closely analogous cases or by "prov[ing] that the right is 'so clear. . . that no one thought it worthwhile to litigate the issue.'" *Dunn v. City of Elgin,* 347 F.3d 641, 650 (7th Cir. 2003) (quoting *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000)). Thus, "[a]lthough earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Green v. Butler*, 420 F.3d 689, 701 (7th Cir. 2005).

Cvicker points to *Olech* and *Esmail* as cases which presents facts similar to the present case. In *Olech*, the court held that the plaintiff stated a claim for equal protection as a class of one where the plaintiff "alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." 528 U.S. at 564. The defendant municipality demanded a 33-foot easement from the plaintiff but only a 15-foot easement from similarly situated neighbors. *Id.* at 565. The plaintiff in *Olech* alleged that this arbitrary and unequal treatment was motivated by ill will resulting from a previous, successful lawsuit against the Village. *Id*. at 563.

In *Esmail*, the court held that the plaintiff, a liquor store owner, stated a claim as a class of one where the defendant mayor allegedly denied the liquor license application submitted by the plaintiff even though the mayor routinely approved applications from others similarly situated who

34

had engaged in the same or similar conduct. 53 F.3d at 178. The plaintiff in *Esmail* alleged that the defendant was motivated by a desire to exact vengeance for the plaintiff's speaking out against perceived ineffective law enforcement. *Id*. In support of his allegation that the mayor harbored ill will towards him, the plaintiff alleged that the mayor caused the police to harass the plaintiff and his employees with constant, intrusive surveillance, caused the police to stop his car repeatedly and force him to take sobriety tests, and caused false criminal charges to be filed against him. *Id*.

The cases cited by Cvicker fail to present facts similar to those in the present case. *Olech* involved an allegation that unequal treatment was motivated by ill will, but the facts are not closely analogous. In *Olech*, the defendant had arbitrarily demanded of the plaintiff a larger easement than her similarly situated neighbors, allegedly because the Village harbored ill will against her. As alleged by the plaintiff, the Village demanded a 33 foot easement even though a 15 foot easement was clearly adequate, such that the demand was "irrational and wholly arbitrary." In contrast, Cvicker's allegations involve actions at least arguably rationally related to ongoing investigations which were at least arguably supported by probable cause. Meyer's actions, unlike those of the Village in *Olech*, were not completely arbitrary.

To be sure, *Esmail* indicates that there may be an equal protection violation if an official coordinates a campaign of harassment which includes the unfair denial of a liquor license, false charges, and harassment of employees with surveillance. However, as with the plaintiff in *Olech*, the central incident in question in *Esmail*, i.e., the denial of a liquor license, was irrational and arbitrary. The defendant, as alleged by the plaintiff, took actions wholly unrelated to a legitimate state objective, and simply denied the liquor license out of spite.[5]

_____

[5] It is also important to note that both *Olech* and *Esmail* were decided by the district court at the motion to dismiss stage and not, as here, at the summary judgment stage.

Although Cvicker has alleged that Meyer's actions were motivated by spite, Meyer did not take any official actions which were clearly arbitrary, such as denying a liquor license to an individual better situated for a license than individuals who did receive a liquor license. As stated above, Meyer's actions were either supported by probable cause or at least rationally related to ongoing investigations supported by probable cause. This includes Meyer's alleged warnings to current or potential employees. As such, and without case law clearly indicating to the contrary, I cannot say that, given the specific facts of this case, Cvicker's constitutional rights under the equal protection clause were clearly established at the time in question.

Cvicker also alleges a substantive due process violation. "A substantive due process claim protects 'the individual against arbitrary action of government.'" *Dick v. Gainer*, 1998 U.S. App. LEXIS 31988, *7 (7th Cir. 1998) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998). "'Only the most egregious official conduct' is arbitrary in the constitutional sense." *Dunn v. Fairfield Comm. High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7th Cir. 1998) (quoting *Lewis*, 523 U.S. at 845). In determining whether an official's conduct is arbitrary, the court looks "for an abuse of power that 'shocks the conscience.'" *Id*.

Given that Meyer's actions were supported by at least arguable probable cause, and that his other actions were at least arguably related to legitimate investigations, I find that Meyer's alleged conduct is not of the type that "shocks the conscience." The substantive due process doctrine is extremely limited in scope, and Meyer's alleged acts are simply insufficient to support a substantive due process violation.

However, Meyer's manner of execution of the search warrant is more problematic. Although Meyer is protected by qualified immunity with regards to the search warrant application, he is not

36

entitled to qualified immunity for his actions taken in the execution of the warrant.  By allegedly exceeding the scope of the warrant and destroying property obtained during the execution of the warrant, Meyer, "confronted with the specific facts at issue and the law in effect at the time, would have known that his conduct violated the plaintiff's constitutional rights."  *Schertz v. Waupaca County*, 875 F.2d 578, 583 (7th Cir. 1989).

Cvicker contends that Meyer exceeded the scope of the search warrant by seizing personal property, including all the documents that Cvicker needed to conduct his business, all documents he intended to present at his divorce trial, all personal documents, all documents relating to his criminal appeal which was pending at the time, all personal communication with his children, and other documents which contained material protect by the attorney client privilege.  (PPFOF ¶ 23.)  Cvicker also contends that Meyer was in charge of the removal of the documents, and ordered officers to remove documents from S.R. Hardscapes and from Cvicker's computer.  (PPFOF ¶ 25.)  Cvicker alleges that very few of the items seized were ever returned to him, and that many documents were destroyed by Meyer.  (PPFOF ¶ 30-31.)

Given these allegations, Cvicker is able to meet the first prong of the qualified immunity test, as he has asserted a violation of a federal constitutional right.   "The Fourth Amendment, made applicable to the states by the Fourteenth Amendment . . . provides that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated.'"  *Pepper v. Oak Park*, 430 F.3d 805, 808 (7th Cir. 2005).  "A 'seizure' of property . . .occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'"  *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).

37

Cvicker has asserted his right to be free from unreasonable searches and seizures under the Fourth Amendment. He has alleged that Meyer, by acting outside the scope of the search warrant and destroying Cvicker's personal property, has meaningfully interfered with his possessory interest in this property. *See, e.g., Pepper*, 430 F.3d at 809 (a couch and television are personal 'effects' protected by the Fourth Amendment); *Perry v. Sheahan*, 222 F.3d 309, 316 (7th Cir. 2000) (physical removal and retention of firearms implicated Fourth Amendment seizure concerns.); *Brindley v. Best*, 192 F.3d 525 (6th Cir. 1999) (qualified immunity was not warranted where officers seized items outside the scope of search warrant).

Cvicker, having asserted a violation of federal constitutional right, must also show that the constitutional standards implicated were clearly established at the time in question. Cvicker can make this showing, as he can point to closely analogous cases which show that a Fourth Amendment violation occurs if officers flagrantly disregard the limited scope of the warrant. For example, in *Brindley*, the court held that "even a valid search warrant can turn into a invalid general search if officers flagrantly disregard the limitations of the warrant. Such action violates the Fourth Amendment." 192 F.3d at 531.

The search warrant in *Brindley* authorized the search for certain business records, but the police officers seized items of jewelry, precious metal, and gems. *Id.* at 534. The court held that this was clearly outside the scope of the warrant, and that the plain view exception did not apply. *Id*. Under the plain view exception, a warrantless seizure of items is allowed if: "(1) the officer is lawfully on the premises; (2) the discovery is inadvertent; and (3) the incriminating nature of the items is immediately apparent." *Id.* (see also *United States v. Cellitti*, 387 F.3d 618, 623 (7th Cir. 2004). The court rejected the application of the plain view exception, reasoning that the

38

incriminating nature of the seized items outside the scope of the warrant was not immediately apparent. *Id*.

In the case at hand, some of the documents seized were clearly outside the scope of the warrant. The warrant was to be used to obtain evidence related to charges of identity theft and bail jumping, and some of the documents allegedly seized were not related to the items authorized for seizure under the search warrant. Moreover, the plain view exception to the warrant requirement does not apply. The documents were not immediately incriminating evidence, and Meyer does not argue that these documents were relevant to any police investigation. As such, the facts of this case are fundamentally similar to those in *Brindley*, such that a reasonable public official would have known that his conduct was unlawful. Simply stated, a reasonable public official would know that seizing and then destroying personal property seized outside the scope of a search warrant would violate the Fourth Amendment. Therefore, Meyer is not entitled to qualified immunity protection from Cvicker's claim of unreasonable search and seizure based on the documents seized outside the scope of the warrant.

## C. Unreasonable Search and Seizure

The next question to address is whether Cvicker's remaining claim of unreasonable search and seizure can survive summary judgment. I conclude that Cvicker has set forth specific facts showing that there is a genuine issue for trial. Specifically, Cvicker has presented evidence that Meyer knowingly seized items outside the scope of the warrant, was aware that some of these items were of personal interest and not evidence of any crime, and purposely destroyed these items.

Cvicker has presented evidence beyond his own personal affidavit to prove that Meyer took documents outside the scope of the search warrant and subsequently destroyed at least some of these

documents; specifically, the declaration of Assistant District Attorney Dennis Krueger, who was in charge of prosecuting Cvicker in Case No. 03-CF-000104 (arson), 05-CF-000035 (insurance fraud and bail jumping), and 05-CF-000368 (bail jumping).

In his declaration, Krueger states that Meyer contacted him and admitted that he had seized items from Cvicker's business which were outside the scope of the search warrant, and that were not included in the return filed with the clerk of courts. (Krueger Decl. ¶ 6.) Meyer asked Krueger for advice regarding what he should do. (Krueger Decl.. ¶ 6.) Meyer initially indicated to Krueger that the items were beyond the scope of the search warrant but were evidence of crimes other than those set forth in the search warrant. Meyer subsequently admitted that Meyer also seized several items of personal interest that were not evidence of any crimes whatsoever. (Krueger Decl. ¶ 7.) Furthermore, Meyer admitted to Krueger that the items seized outside the scope of the warrant were not properly itemized on the search warrant "return" on file with the clerk of courts. (Krueger Decl. ¶ 8.) Meyer never allowed Krueger to examine the items that were seized. (Krueger Decl. ¶ 9.) Krueger further states that after a lengthy discussion regarding the execution of the search warrant and the seizure of items outside the scope of the search warrant, he advised Meyer to amend the "return" on file with the clerk of courts so that all of the items seized were documented and itemized therein (Krueger Decl. ¶ 10) Krueger indicated to Meyer that, with regard to items that were evidence of other crimes, Krueger needed to do some legal research regarding a possible application for an additional search warrant. Krueger told Meyer that he would get back to him in this regard (Krueger Decl. ¶ 11.). With regard to items of personal property that were not evidence of any crime, Krueger indicated to Meyer that these items would need to be returned to the owner. (Krueger Decl. ¶ 12.) At no time did Krueger advise Meyer to destroy any documents or items seized. (Krueger

40

Decl. ¶ 13.) Later that same day, Krueger contacted Meyer to discuss the seizure of evidence outside the scope of the warrant, when to his surprise and disbelief, Meyer informed Krueger that he, Krueger, did not need to worry about this anymore because he, Meyer, destroyed the items taken that were outside the scope of the search warrant. (Krueger Decl. ¶ 14.) At no time during Krueger's initial discussions with Meyer did Meyer tell Krueger that he was going to destroy the items. (Krueger Decl. ¶ 15.) Krueger immediately advised Meyer that he, Meyer, must document the fact that he destroyed these items and the he, Meyer, should set forth what items were destroyed. (Krueger Decl. ¶ 16.)

Meyer contends that the only documents taken which were outside the scope of the search warrant were documents relating to a PeopleFinder search conducted by Cvicker of Gregory Tarkanian, Michele Cvicker's brother. Meyer argues that he had been previously informed by Michele Cvicker that she was concerned Cvicker was stalking her and that he would follow her and Tarkanian on a vacation. Meyer claims that he took the documents out of concern for her safety. (DPFOF ¶ 59.) Meyer contends that he took these documents to the police station and copied them, and then returned them to the place where they were found to avoid alerting Cvicker that the documents had been found and copied. (DPFOF ¶ 60.) According to Meyer, included in these documents were three e-mails totaling 24 pages. (DPFOF ¶ 61.) Meyer maintains that the only documents he destroyed were the copies of these three e-mails. (DPFOF ¶ 65.) Meyer denies that he seized large amounts of documents which he placed in large trash bags during the warrant execution, and rather contends that the limited documents that he did take were placed in paper evidence bags, which were the size of small grocery bags. (DPFOF ¶ 64.) Cvicker presents the declaration of Investigator Winger to support his assertion that he did not destroy evidence

41

subsequent to the review of documents.  More precisely, in her declaration, Winger states: "At no time during the search or the subsequent review of documents did I observe Investigator Meyer destroy evidence or attempt to hide evidence."  (Winger Decl.¶ 12.)

However, Cvicker has presented evidence, through the affidavits/declarations of employees who were present at S.R. Hardscapes during the execution of the search warrant, that large amounts of documents were taken from the business, some of which were not placed in evidentiary bags. (Lenartowski Decl. ¶ 15; Schultz Decl. ¶¶ 8-9.)    Furthermore, Cvicker has provided some corroboration of his claim of the existence of certain documents relating to legal matters at S.R. Hardscapes at the time of the seizure, which documents were taken and not returned.  (Lettenberger Aff. ¶ 5.)  Although this evidence does not concretely establish precisely what was taken during the execution of the warrant or thereafter destroyed, it is sufficient, in combination with the declaration of Krueger, to create a genuine issue of material fact with respect to that aspect of Cvicker's Fourth Amendment claim dealing with the manner of execution of the search warrant.

## D. Failure to Cooperate with Discovery

Cvicker argues that, pursuant to Fed. R. Civ. P. Rule 56(f), summary judgment should not be granted because Meyer has failed to provide discovery materials essential to Cvicker's opposition to the motion.  Under Fed. R. Civ. P. Rule 56(f):

> When Affidavits are Unavailable. Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

According to Cvicker, Meyer failed to comply with Requests for Production of Documents and refused to answer questions at his deposition on December 2, 2005.  Cvicker argues that these

Case 2:05-cv-00576-WEC    Filed 03/20/07    Page 42 of 44    Document 64

discovery materials are central to the issue of his arrest on July 14, 2005 on alleged bail jumping and insurance fraud, the execution of the search warrant on July 15, 2005, and the intimidation of his employees at about the same time. (Pl.'s Br. at 10.)

However, Cvicker has failed to identify exactly which document requests Meyer has refused to comply with. Furthermore, Cvicker has not indicated that he has attempted to depose Meyer since the original deposition on December 2, 2005. As such, Cvicker has not provided a clear basis for denying summary judgment, as he has not provided an indication of what discovery he still needs, or what additional information this additional discovery would provide which is relevant to the summary judgment motion.

Regardless, any additional discovery would not impact the disposition of the motion for summary judgment. Meyer is entitled to qualified immunity on certain claims, and this determination was made taking Cvicker's allegations as being true. Moreover, Cvicker has presented sufficient evidence to create a genuine issue of material fact as to that facet of his Fourth Amendment claim which is predicated on Meyer's seizing items beyond the scope of the warrant, and thus additional discovery is unnecessary at this point for this claim.

**E. Adequate State Law Remedies**

Meyer argues that the availability of state law remedies bars Cvicker's § 1983 claim. Specifically, Meyer contends that Cvicker's claim is that of malicious prosecution, which is recognized by Wisconsin law as a tort.

It is not necessary to address this argument. Meyer is entitled to qualified immunity for his actions which could arguably fall under the realm of malicious prosecution under Wisconsin law.

Cvicker's unreasonable search and seizure claim under the Fourth Amendment does not implicate malicious prosecution, and thus Meyer's state law remedy argument does not apply.

## V. CONCLUSION

Cvicker's claims relating to his arson conviction are unable to survive summary judgment because his conviction has not been invalidated. Moreover, Meyer is entitled to qualified immunity for all of his other actions not involving the execution of the search warrant, as his actions were supported by at least arguable probable cause and did not rise to the level of being an Equal Protection or Substantive Due Process violation. However, Cvicker has created a genuine issue of material fact with respect to that aspect of Cvicker's Fourth Amendment claim dealing with the manner of execution of the search warrant.

**NOW THEREFORE IT IS ORDERED** that, in accordance with the foregoing decision, the defendant's motion for summary judgment be and hereby is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that on Monday, April 9, 2007, at 9:00 a.m. in Room 253 of the United States Courthouse, 517 E. Wisconsin Ave., Milwaukee, Wisconsin, a scheduling conference will be conducted to discuss with the parties the further processing of this case to final resolution.

**SO ORDERED** this 20th day of March 2007, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

44