UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STEPHEN D. CVICKER,

    Plaintiff,

v.                                                   Case No. 05-C-0576

LARRY P. MEYER,

    Defendant.

**DECISION AND ORDER ON DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S EXPERT REPORTS**

**I. BACKGROUND**

This action was commenced on May 24, 2005, when the plaintiff, Stephen D. Cvicker ("Cvicker"), filed a complaint in the Eastern District of Wisconsin alleging that his First and Fourteenth Amendment rights were violated by the defendant, Larry P. Meyer ("Meyer"), in violation of 42 U.S.C. § 1983. On September 15, 2005, Cvicker filed an amended complaint which contained essentially the same allegations as had been set forth in the original complaint, as well as additional allegations of retaliation for Cvicker's filing of the complaint on May 24, 2005.[1]

On June 29, 2006, Meyer filed a motion for summary judgment. On March 20, 2007, the court granted the motion in part and denied the motion in part. Specifically, the court granted the defendant's motion for summary judgment relating to Cvicker's claims concerning his arson

---

[1] In his brief in opposition to the defendant's motion for summary judgment, Cvicker also asserted that Meyer violated his Fourth Amendment rights, and presented facts in support of this assertion.

conviction because his conviction had not been invalidated. Moreover, the court found that Meyer was entitled to qualified immunity for all of his other alleged actions not involving the execution of the search warrant on July 15, 2005. However, the court denied the defendant's motion for summary judgment with respect to that aspect of Cvicker's Fourth Amendment claim dealing with the manner of execution of the search warrant. Trial is currently scheduled for August 11, 2008.

Currently pending before the court is the defendant's motion to strike the plaintiff's expert reports. This motion is fully briefed and ready for resolution. For the reasons which follow, the defendant's motion to strike the plaintiff's expert reports will be granted in part and denied in part.

Before proceeding any further, however, I want to set the stage for the somewhat hedging, conditional, and non-definitive language used in parts of this decision. The defendant's motion is styled a "motion to strike plaintiff's expert reports." But, it is really more in the nature of a motion in limine, i.e., a motion to bar the experts' testimony at trial. After all, the written reports themselves are hearsay and would not necessarily be admissible at trial. Thus, to ask that the reports be "stricken" does not entirely make sense (at least to me).

As with most motions in limine, how the court rules on the admissibility of any evidence, including the testimony of experts, will become more definitive as trial becomes more imminent, as trial commences, and as trial proceeds. However, the instant decision is being issued now so as to give the parties some guidance and direction as they proceed down the road of taking further discovery in anticipation of trial.

## II. DISCUSSION

Meyer has filed a motion to strike the reports of the plaintiff's experts, Gilles P. Meurice ("Meurice") and Dennis Waller ("Waller"). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

The trial judge is to exercise gate-keeping responsibility with respect to the admission of expert testimony and opinions, and thereby "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharms*., 509 U.S. 579, 589 (1993). The court "must determine at the outset whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id*. at 592. This determination involves "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93.

*Daubert* provides a list of four factors to be used in determining the soundness of the methodology: "(1) whether the proffered conclusion lends itself to verification by the scientific method through testing; (2) whether it has been subjected to peer review; (3) whether it has been evaluated in light of the potential rate of error of the scientific technique; and (4) whether it is consistent with the generally accepted method for gathering the relevant scientific evidence."

3

*Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (citing *Daubert*, 509 U.S. at 594-95).

However, this list of four factors is non-exclusive and does not constitute a definitive checklist or test. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). Rather, regardless of the specific factors used, the lower court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152. In making this determination, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id*.

Meyer argues that the opinions of the plaintiff's experts go far beyond the remaining claim, i.e., that the manner of execution of the search warrant at Cvicker's business on July 15, 2005, violated his Fourth Amendment rights. Specifically, Meyer contends that the opinions in the Meurice report must be stricken because: (1) the opinions in the report concern issues that are not before the court; and (2) the opinions lack sufficient facts or data, and there is an absence of reliable principles or methods to support the conclusions. Moreover, Meyer contends that the opinions in the Waller report must be stricken because: (1) the opinions in the report relate to claims that have been dismissed; and (2) the only opinion that does not relate to dismissed claims is a legal conclusion. The expert reports of Meurice and Waller will be discussed in turn.

**A. Meurice Report**

The Meurice report, issued on May 14, 2007, contains two opinions: (1) the value of the real estate and manufacturing contracts signed with Mountain West in July 2005; and (2) the value of S.R. Hardscapes, Inc. ("S.R. Hardscapes") in early 2005 when Cvicker was negotiating with Mountain West for the sale of his business. In his report, Meurice opines that, based on the net present value-

cash flow method, the value of the Mountain West contracts was between $550,000 and $1,100,000. Meurice further opines that, based on the net present value-cash flow method, the value of S.R. Hardscapes in early 2005 was in the range of $600,000 and $2,300,000.

Meyer first argues that both opinions concern issues that do not relate to the only remaining claim, which claim concerns the manner of execution of the search warrant at the plaintiff's business on July 15, 2005. According to Meyer, both opinions relate to the defendant's actions in early 2005, and these actions are unrelated to the alleged improper manner of the search in July 2005. As such, the first issue to consider is whether "the testimony will assist the trier of fact with its analysis of any of the issues involved in the case." *Smith*, 215 F.3d at 719.

As an initial matter, the defendant's argument concerning the contracts signed with Mountain West in July 2005 is somewhat unclear. Meurice's report states that he is providing his opinion on the value of the Mountain West real estate contract and manufacturing contract signed in *July* 2005. (Meurice Rep. at 5.) The defendant, in his brief in support of his motion to strike, also states that the Meurice Report contains an opinion concerning "the value of the real estate lease contract signed with Mountain West in *July* of 2005." (Def.'s Br. at 5.) (emphasis added). However, later in his brief Meyer argues that "Mr. Meurice purports to offer an opinion as to the value of a contract with Mountain West in January 2005," and that "[t]his claim was specifically addressed and dismissed by the Court on summary judgment." (Def.'s Br. at 5; citing Decision and Order at 4 and 44.) In its Decision and Order of March 20, 2007, the court found that Meyer was entitled to qualified immunity for all of his other actions not involving the execution of the search warrant. (Decision and Order at 44.)

5

Meurice's report does not provide any indication that Cvicker signed a contract with Mountain West in January 2005. Rather, the report explicitly states that the contracts were signed in July 2005. Although there is other evidence which makes it not entirely clear exactly when these contracts were signed, there is no evidence which indicates that these contracts were signed in January 2005.[2]

Regardless of exactly when these contracts were signed, it seems to me that the value of the contracts with Mountain West *might* still be relevant to Cvicker's remaining claim concerning the manner of the execution of the search warrant. In his amended complaint, Cvicker alleges that, during the execution of the search warrant, Meyer:

> removed . . . all of the purchasing and manufacturing agreements having to do with Cvicker's recent and current transactions with Mountain West Products, L. L. C., all manufacturing agreements or other contracts between Cvicker's business and its suppliers or customers, and all travel documents related to Cvicker's recent trip out of state on business with Mountain West Products, L. L. C.

(Am. Compl. ¶ 417.)

Given that the contracts with Mountain West were part of the materials allegedly taken by Meyer during the execution of the search warrant, the value of these contracts could conceivably be relevant to the question of damages caused by the manner of the execution of the search. Contrary

---

[2]Meyer notes that Cvicker testified at his divorce trial that all of the property owned by S.R. Hardscapes was sold to Mountain West around June 1, 2005. (Braithwaite Decl., Ex. A, Transcript Vol. I at 15-18.) Cvicker further testified that his successor business, Whitewater Rock and Mulch, began operations on June 1, 2005. (*Id*. at 49.) The receiver for S.R. Hardscapes, Attorney Michael Meurer, testified at the divorce trial that the negotiations with Mountain West closed on June 17, 2005 (Braithwaite Decl., Ex. B, Transcript Vol. II at 11-12.) As such, it is not entirely clear when the contracts with Mountain West were signed (or whether the sale of S.R. Hardscapes to Mountain West was part of the real estate and manufacturing contracts signed by Mountain West in July 2005 or an entirely separate transaction). However, none of the submitted materials indicate that the contracts were signed in January 2005.

6

to the defendant's argument, Cvicker's claim for damages arising from the improper removal and disposal of materials (which I assume the plaintiff maintains included contracts with Mountain West) would still seem to be viable under the lone remaining claim.

The relevance of Meurice's opinion regarding the value of S.R. Hardscapes in early 2005 to Cvicker's Fourth Amendment claim is less clear. Cvicker has not provided any response to Meyer's contention that this opinion does not relate to Meyer's conduct in executing the search warrant.[3] Meurice states in his report that Cvicker's actual loss when S.R. Hardscapes collapsed was between $0.6 million and $2.3 million, and that the cause of this collapse was the inability to hire employees and the loss of business records. (Meurice Rep. at 15.) This would seem to suggest that Meurice's opinion as to the value of S.R. Hardscapes in early 2005 would be used by the plaintiff to show the damages caused by the improper taking of business records during the search.

However, it is not at all clear why the value of S.R. Hardscapes in early 2005 would be relevant to the issue of damages allegedly caused by a search that did not occur until July 2005. The submissions indicate that at the time of the execution of the search warrant, S.R. Hardscapes had already been sold to Mountain West, and Cvicker had begun operation of a new business, Whitewater Rock and Mulch, in the former location of S.R. Hardscapes. As such, it is unclear whether Meurice is purporting to offer his opinion as it relates to the damages suffered by Cvicker when S.R.

---

[3]In fact, Cvicker did not provide any response to any of the defendant's arguments relating to the relevancy of Meurice's opinions to Cvicker's lone Fourth Amendment claim. In his response, Cvicker only discusses the reliability of Meurice's report.

7

Hardscapes collapsed (or was sold) prior to the execution of the search warrant, or when Whitewater Rock and Mulch (the successor business to S.R. Hardscapes) collapsed after the search.[4]

Regardless, it does not appear that Meurice's opinion as to the value of S.R. Hardscapes in early 2005 is relevant to a determination of the damages allegedly suffered by Cvicker as a result of a search conducted in July 2005. If Meurice's opinion purports to relate to the collapse and/or sale of S.R. Hardscapes, his opinion would not seem to be relevant because these events occurred well prior to the search in July 2005. To reiterate, at the time of the search, S.R. Hardscapes had already been sold and Whitewater Rock and Mulch occupied its former location.

The next issue to address is whether Meurice's opinion as to the value of the Mountain West contracts is reliable.[5] Meyer argues that Meurice's opinions are "nothing more than junk science" because the report relies on unsupported assumptions and fanciful projections which do not meet the minimum standards of financial analysis. (Def.'s Br. at 6.) Meyer does not dispute the reliability of the net present value-cash flow method employed by Meurice in his report. Rather, Meyer contends that Meurice failed to properly follow this method.

In his report, Meurice outlines the three steps involved in the net present value-cash flow approach. Step one is the development of a three to five year cash flow forecast. Meurice notes that this "cash flow forecast can be derived from pro-forma profit and loss statements and pro-forma balance sheets. Often the potential buyer will be able to use the financial statements of the last three

---

[4]It is also unclear whether Whitewater Rock and Mulch did, in fact, collapse at some point after the execution of the search warrant.

[5]Given that Meurice's opinion regarding the value of S.R. Hardscapes in early 2005 would not seem relevant to Cvicker's remaining Fourth Amendment claim, it is not necessary to discuss whether this opinion is sufficiently reliable.

8

years." (Meurice Rep. at 7.) Step two is the net present value calculation and the discounting of cash flows. This step involves valuing the "cash flow stream, generated by those assumptions, by discounting it appropriately as discussed earlier and by adding additional value for the company assumed to operate indefinitely beyond the three to five year planning horizon." (Meurice Rep. at 8.) Step three is the determination of the offering price. This step involves a determination of "the offering price based on the amount of debt to be assumed by the buyer." (Meurice Rep. at 8.)

In determining the value of the Mountain West real estate and manufacturing contracts, Meurice concluded that the contracts were worth between $550,000 and $1,100,000. Meurice noted that the "range in value results from the uncertainty of the many necessary assumptions to make the five year cash flow projection. The uncertainty is not due to business conditions but instead to the lack of time to do a thorough appraisal and the paucity of financial records." (Meurice Rep. at 9.) In making his determination, Meurice relied on the "S.R. Hardscapes Inc. 2002 and 20003 tax returns, inventory values from various internal financial reports, the two Mountain West Contracts and a conversation with Mr. Cvicker about key cost drivers." (Meurice Rep. at 9.)

Meyer argues that relying on the 2002-2003 tax returns is far different from using the past three years of financial statements, particularly in light of the fact that Meurice's opinion concerns contracts signed in July 2005. Moreover, Meyer contends that the Meurice report fails to consider the impact of taxes or debt on the value of Cvicker's business,[6] and that this omission is of importance given the substantial debt of the business. In particular, Meyer notes that Meurice failed to address in his report: the failure of S.R. Hardscapes to pay payroll or sales taxes, the lawsuits filed

---

[6]The Meurice report analyzes the financial condition of S.R. Hardscapes. It is unclear whether the contracts with Mountain West involve S.R. Hardscapes or Cvicker's new business, Whitewater Rock and Mulch (or both).

9

against S.R. Hardscapes, the substantial debts to trade debtors and governmental entities, the lack of profit for the prior five years, the substantial decline in revenue following the loss of the Menard's account, and the existence of $425,000 in mortgage debt and real estate liens on the property. (Def.'s Br. at 8.)

Although the difficult financial circumstances faced by S.R. Hardscapes may undermine the reliability of Meurice's opinion as to the value of S.R. Hardscapes in early 2005, I am not convinced that this also renders unreliable Meurice's opinion as to the value of the Mountain West real estate and manufacturing contracts. To be sure, Meurice does not use the financial statements of the last three years, as outlined under his net present value-cash flow method. Meurice appears to have relied on the only financial records available to him, and he acknowledges the paucity of records in explaining the range in value of the contracts. Moerover, Meurice addresses his omission of the impact of income taxes, although he notes that "[f]our of the five years show a taxable loss and any taxable income could probably be offset by previous accumulated tax losses." (Meurice Rep. at 13.)

However, much of Meurice's projection of the contracts' value is based on the specific terms of the Mountain West contracts, including a minimum annual order of $1.5 million under the manufacturing contract, an agreement for 750,000 tube sand bags, and an agreement regarding retail sales. The projection is also largely based on Cvicker's personal communication of the key cost drivers to Meurice. The information found in the 2002 and 2003 tax records was primarily used to supplement the more current information Meurice gathered from Cvicker and from the terms of the contracts.

Whether Cvicker provided accurate information to Meurice, or whether Meurice properly analyzed the terms of the contract, are matters to be considered by the trier of fact. As stated by the

10

Seventh Circuit, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Although Meyer may believe that these factual underpinnings are shaky, "[v]igorous cross examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

In sum, I conclude that Meurice's opinion as to the value of the Mountain West contracts is based on methodology that is sufficiently reliable. Moreover, as noted above, Meurice's opinion as to the value of the Mountain West contracts may very well assist the trier of fact. Such being the case, I am inclined at this point in time to allow Meurice to testify as to his opinion of the value of the Mountain West contracts. It goes without saying, however, that any opinion regarding the value of the Mountain West contracts will only be relevant if the plaintiff can tie the loss of such contracts (and damages flowing therefrom) to the manner of the execution of the search warrant.

**B. Waller Report**

The Waller report, issued on May 14, 2007, contains the opinions of Dennis Waller, a certified police training instructor who has served as a police officer, field training officer, detective, sergeant, lieutenant, department training officer, and chief of police. (Waller Rep. at 1.) Waller trained hundreds of officers in numerous subject areas, including criminal investigation, search warrants, and professional ethics. (Waller Rep. at 1.) Waller offers his opinions in the report "[b]ased on the totality of my training, education, and experience in law enforcement; as a trainer; as an educator; and, as a consultant," and states that his opinions are developed "to a reasonable degree of police practice." (Waller Rep. at 4.)

11

Meyer objects to all of Waller's opinions contained in his report. First, Meyer argues that opinions A, B(1), and B(2) relate to claims that have already been dismissed. Opinion A states:

> A. Investigator Meyer obviously had more than an objective, professional law enforcement interest in the activities of Stephen Cvicker. The purpose of an investigation is to determine the truth.
>
> > 1. It is clear that Investigator Meyer failed to objectively investigate Michelle Cvicker's involvement and culpability in potential criminal activity involving the family-owned business; or, to investigate her involvement and culpability in the same manner in which he conducted an on-going investigation of Stephen Cvicker.
> >
> > 2. Instead of conducting an investigation of Stephen Cvicker and reporting the results to the District Attorney's Office for potential prosecution, Investigator Meyer conducted what appeared to be a personal crusade against Mr. Cvicker. This crusade, which can be likened to a personal vendetta, negatively impacted Mr. Cvicker's marriage, business, and personal freedom.

(Waller Rep. at 4-5.)

Meyer argues that Opinion A relates to Meyer's lack of investigation of Cvicker's ex-wife or his alleged personal crusade against Cvicker, and that these issues have already been dismissed on summary judgment. Opinion A, according to Meyer, does not relate to Cvicker's only remaining claim regarding the manner of the execution of the search warrant on July 15, 2005. After reviewing Waller's report and the court's summary judgment decision of March 20, 2007, I conclude that Opinion A does not relate to Cvicker's only remaining claim, and thus would not assist the trier of fact to understand or determine a fact in issue in this case.

Opinion A discusses Meyer's allegedly improper motives for investigating Cvicker. However, the court has already determined that, even if Meyer failed to objectively investigate Michelle Cvicker and engaged in a personal crusade against Cvicker by aggressively investigating him, Meyer was still entitled to qualified immunity because his actions were supported by at least

12

arguable probable cause. In its Decision and Order of March 20, 2007, the court found that Meyer's actions in investigating Cvicker, including arresting him and obtaining the search warrant, were supported by at least arguable probable cause. (Decision and Order at 24-25, 29.) Moreover, the court noted in its Decision and Order, "[r]egardless of the defendants' motives toward the plaintiff, the existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest, false imprisonment, or malicious prosecution.'" (Decision and Order at 24; quoting *Williams v. Vasquez*, 62 Fed. Appx. 686, 691 (7th Cir. 2003)). Such being the case, despite any arguable evidence of improper motive, the court concluded that Meyer was entitled to qualified immunity because "Meyer has established that he had at least 'arguable probable cause' to arrest and investigate Cvicker, and to obtain the search warrant." (Decision and Order at 30.)

Opinion A thus relates to claims that have already been dismissed by the court. Opinions regarding Meyer's allegedly improper motives for investigating Cvicker do not directly relate to the remaining claim concerning the manner of execution of the search warrant.[7] Indeed, regardless of whether Meyer's conduct (including the search) was due to improper motives, there would be no Fourth Amendment violation if Meyer had conducted the search within the scope of the search warrant.

Moreover, even if Waller's opinion regarding Cvicker's motives was related to the manner of execution of the search warrant, this opinion would nevertheless be inadmissible speculation. Waller has no sound basis for his opinions regarding the personal motivations for Cvicker's conduct.

---

[7]It is possible that Meyer's motives for investigating Cvicker could be relevant in a determination of whether Meyer purposefully exceeded the scope of the search warrant. However, Opinion A appears to largely relate to Meyer's motives for his conduct in aggressively pursuing Cvicker prior to his conducting the search. In any event, as will be discussed, Waller lacks the proper basis for his expert opinion regarding Meyer's personal motivations.

13

Although Waller, as an expert regarding proper police procedure, could testify as to whether Cvicker's alleged conduct violated police procedures or was inconsistent with an objective investigation, he cannot testify as an expert that Cvicker had a particular motive. *See DePaepe v. GMC*, 141 F.3d 715, 720 (7th Cir. 1998) (finding that an engineering expert could testify that a certain type of padding could save money, or that the company's explanation for using that padding was not sound, but he could not testify that the company's motive was to save money). Waller's opinion that Meyer had a personal interest in the activities of Cvicker and conducted his investigation because of a personal vendetta would be inadmissible speculation.

Such being the case, Waller will not be allowed to testify that, in his opinion, Meyer obviously had more than an objective, professional law enforcement interest in the activities of Cvicker, and engaged in a personal vendetta against Cvicker.

Meyer also argues that Opinions B(1) and B(2) involve claims that have already been dismissed. Specifically, Meyer contends that Opinion B(1) relates to the propriety of the application of the search warrant, and that Cvicker's claim relating to the search warrant application has already been dismissed. Moreover, according to Meyer, Opinion B(2) relates to the claim regarding Meyer's personal interest in Michele Cvicker and her divorce proceeding, and this claim has also been dismissed. Opinions B(1) and B(2) state:

> B. Investigator Meyer's actions violated ethical considerations and nationally accepted standards of law enforcement conduct in the manner in which he interacted with Cvicker.
>
>> 1. "The Law Enforcement Code of Ethics" states in part . . . my fundamental duty is . . . to protect the innocent against deception, the weak against oppression . . . "

. . .

14

    b. Presenting a limited version of the facts and shopping for a prosecutor willing to provide what the investigator wants without a comprehensive review are indicative of a personal motive. It is inconsistent with having an objective, professional assessment of the circumstances.

    c. Obtaining a search warrant in this manner tends to negate the safeguards built into our system to protect the rights of individual from unreasonable search and seizure by agents of the state.

  2. "The Law Enforcement Code of Ethics" states in part, "Whatever I see or hear of a confidential nature or that is confided in me in my official capacity will be kept ever secret unless revelation is necessary in the performance of my duty."

    a. Investigator Meyer admitted that during the service of the search warrant on July 15, 2005, he seized items of personal interest that were not evidence of any crimes.

    b. Investigator Meyer provided information from his criminal investigation to Michelle Cvicker useful to her civil divorce proceeding. . .

(Waller Rep. at 5-6.)

  In its Decision and Order of March 20, 2007, the court, in concluding that Meyer was entitled to qualified immunity, stated that "[d]espite the manner in which Meyer obtained the search warrant, I nevertheless conclude that the information Meyer submitted to the judicial officer in support of the search warrant was sufficient to establish probable cause." (Decision and Order at 29.) As such, the court has already dismissed Cvicker's claim relating to the alleged improper obtaining of the search warrant. The only remaining claim relates to the manner of execution of this search warrant, and Cvicker's motive for obtaining the warrant does not relate to this remaining claim.

  That having been said, in his amended complaint, Cvicker alleges that, during the execution of the search warrant, Meyer:

15

> removed all documents and notes regarding Cvicker's pending divorce. . . [and] ransacked the mobile home containing nothing but personal documents unrelated to the search warrant, including many documents from the divorce. He either seized those things, which were patently beyond the scope of the warrant, or he took them personally to the police station to make copies of them for his own personal purposes before returning them to the mobile home.

(Am. Compl. ¶ 417.)

The alleged improper removal of documents related to Cvicker's pending divorce and the copying of these documents for personal use would seem to be related to Cvicker's claim regarding the manner of execution of the search warrant. Waller's opinion, in essence, states that seizing items of personal interest unrelated to evidence of a crime and providing information useful to a divorce proceeding violate ethical considerations and nationally accepted standards of law enforcement. To the extent that these actions occurred during or as a result of the search on July 15, 2007, I am inclined at this point in time to allow Waller to testify as to whether these actions violated the law enforcement code of ethics.

Meyer also argues that Opinion B(3) merely restates Dennis Krueger's declaration, and that Waller has no personal knowledge of the accuracy of Krueger's declaration. Opinion B(3) states:

> 3. "The Law Enforcement Code of Ethics" states in part, "I will never act officiously or permit personal feelings, prejudices, animosities or friendships to influence my decisions . . . I will enforce the law courteously and appropriately without fear or favor, malice or ill will. . ."
>
> > a. Investigator Meyer admitted to A/DA Krueger that during the July 15, 2005, service of the search warrant of the Cvicker premises he had seized items that exceeded the scope of the search warrant.
> >
> > b. Investigator Meyer admitted he had seized items of personal interest that were not evidence of any crimes.
> >
> > c. Investigator Meyer admitted the items outside the scope of the search warrant were not properly itemized on the return.

>    d.    Investigator Meyer advised A/DA Krueger that he had destroyed the items seized which were outside the scope of the search warrant.

(Waller Rep. at 6.)

Contrary to Meyer's assertion, Waller is not merely reciting Krueger's declaration, but rather is opining whether Meyer's alleged conduct was in violation of "The Law Enforcement Code of Ethics." Waller need not be a firsthand witness to offer this opinion. *See Daubert*, 509 U.S. at 591 ("an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation."). Waller has personal knowledge of the code of ethics, and can provide his opinion regarding the applicability of the code of ethics using the facts as they were provided to him. As such, I am inclined at this point in time to allow Waller to testify as to whether Meyer's conduct, as laid out in Krueger's declaration (and as Krueger will presumably testify at trial), would violate the law enforcement code of ethics.[8]

Meyer next argues that Opinion C goes beyond the proper role of an expert witness because it purports to determine the legal issue that remains in the case, and purports to explain the meaning of several Wisconsin statutes. Opinion C states:

>  C.    While conducting the search warrant of July 15, 2005, Investigator Meyer seized, or caused to be seized, items from the business which exceeded the scope of the search warrant; items of personal interest which were not evidence of any crimes; items outside the scope of the warrant; and items which were not properly itemized on the return. These improper seizures and the subsequent handling of evidence were inconsistent with Wisconsin State Statutes, law enforcement training, and investigate protocols.

. . .

---

[8] However, as noted above, Waller cannot testify as an expert regarding Meyer's motives, and thus would not be allowed to testify as to whether Meyer acted due to "personal feelings, prejudices, animosities or friendships," or "out of malice or ill will."

17

      1.     WSS 968.12 states in part: "A search warrant is an order signed by a judge directing a law enforcement officer to conduct a search of . . . a designated place for the purpose of seizing a designated property of kinds of property."

      2.     Police officers are trained that when conducting a search warrant, they may only seize items listed on the search warrant, contraband, or evidence of the commission of any crime.

      3.     Seizure of items outside the scope of the search warrant or established exceptions, seizure of items of personal interest, and seizure of items not properly itemized on the return are clearly inconsistent with nationally accepted standards of law enforcement training and practice.

      4.     Failing to properly account for all items seized during the service of a search warrant is a violation of established legal procedures and nationally accepted standards of law enforcement training and practice.

          a.     WSS 968.17 states in part: "The return of the search warrant shall be made within 48 hours after execution to the clerk designated in the warrant. The return shall be accompanied by a written inventory of any property taken."

          b.     Police officers are trained to properly account for all items seized during the services of a search warrant, whether those items be specifically listed in the search warrant or an established exception.

      5.     Per WSS 968.20 property seized which is not needed as evidence in further court proceedings, property which is not contraband, or items for which the owner is not otherwise precluded from ownership are to be returned to the owner. Investigator Meyer advised A/DA Krueger that he destroyed the [items] taken outside scope of the search warrant.

(Waller Rep. at 4-7.)

As noted by the Seventh Circuit, experts may not offer opinions concerning "legal issues that will determine the outcome of a case." *United States v. Sinclair*, 74 F.3d 753, 758 n.1 (7th Cir. 1996) (see also *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

18

Stated another way, experts "cannot testify about legal issues on which the judge will instruct the jury." *Id*.

However, Opinion C does not purport to determine the legal issue that remains in the case. Waller's opinion only relates to the issue of whether Cvicker's conduct in executing the search warrant violated accepted standards of police protocol, of which Waller is familiar. At issue in this case is whether the manner of Meyer's execution of the search warrant violated Cvicker's Fourth Amendment rights. A determination of whether Cvicker's conduct during the search violated Wisconsin state statutes, law enforcement training, or investigative protocols is not dispositive of the legal issue of whether there was a Fourth Amendment violation. Waller is not offering any opinion as to whether Cvicker's conduct rises to the level of violating the Fourth Amendment.

It is true that Waller's opinion may appear to engage in technically explaining the meaning of Wisconsin statutes. However, as noted above, an opinion that Meyer's conduct violated Wisconsin statutes is not the equivalent of an opinion that Meyer's conduct violated Cvicker's Fourth Amendment rights. Moreover, Waller's opinion is not a complex legal analysis of the meaning of a statute. Rather, Waller is offering his opinion that Cvicker's conduct was inconsistent with established police protocols, including those found in the Wisconsin statutes. The Wisconsin statutes contain specific instructions, and law enforcement officers are presumably trained to follow these instructions. Waller, as a certified police training instructor in Wisconsin, is qualified to offer his opinion as it relates to these established police protocols. Waller has presumably provided training to officers regarding following the proper protocols in executing a search warrant, including those protocols found in the Wisconsin statutes.

19

As such, I am inclined at this point in time to allow Waller to offer his opinion that Meyer's conduct in the manner of executing the search warrant was inconsistent with Wisconsin State Statutes, law enforcement training, and investigate protocols.

### III. CONCLUSION

In sum, and for all the foregoing reasons, Meurice will not be allowed to testify as to his opinion regarding the value of S.R. Hardscapes in early 2005. Meurice may very well be allowed to testify as to his opinion of the value of the Mountain West contracts.

Waller will not be allowed to testify that, in his opinion, Meyer obviously had more than an objective, professional law enforcement interest in the activities of Cvicker, and engaged in a personal vendetta against Cvicker. Waller will also not be allowed to testify regarding the alleged improper obtaining of the search warrant. However, Waller may very well be allowed to offer his opinion that actions which occurred during or as a result of the search on July 15, 2007 violated the law enforcement code of ethics. Furthermore, Waller may very well be allowed to offer his opinion that Meyer's conduct in executing the search warrant was inconsistent with Wisconsin State Statutes, law enforcement training, and investigate protocols.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion to strike plaintiff's liability expert be and hereby is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED** this 4th day of April 2008, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge